**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF AN APPLE IPHONE WITH IMEI 357197859425327, AND ASSIGNED CALL NUMBER 207-405-1984 | No. 2:23-mj-285-KFW |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION**
**UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE**

I, Garrett Drew, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a Special Agent with the Federal Bureau of Investigation, and have been since March 1, 2020. I am currently assigned to the FBI's Portland, Maine Resident Agency. As part of my duties as an FBI Special Agent, I investigate criminal violations relating to international and domestic terrorism and other threats to national security and public safety. Prior to joining the FBI, I was a Special Agent with the United States Secret Service from 2015 to 2020. Among other assignments, I was detailed to the FBI Joint Terrorism Task Force as an investigator in the FBI New York Field Office. From 2009 until 2015, I was employed as a police officer in the state of New Hampshire. In my career, I have utilized various investigative tools and techniques, to include the use of search warrants involving cellular data.

3. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

4. The property to be searched is an Apple iPhone with IMEI 357197859425327, and assigned call number 207-405-1984 (hereinafter, "Target Device 1"). Target Device 1 is currently located at the Portland, Maine office of the Federal Bureau of Investigation.

5. The applied-for warrant would authorize the forensic examination of the Target Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

6. I hereby incorporate by reference the facts presented in my affidavit filed in support of an application for a Geo-Fence search warrant dated August 25, 2023, attached as Exhibit 1.

7. On June 29, 2023, Task Force Officer Jonathan Duquette and I interviewed Michael Hall. Prior to the interview, Hall was read his Miranda Rights by Adam Temple of the Sagadahoc County Sherriff's Office. Hall agreed to speak to me and other law enforcement officers and said the following in summary and relevant part:

   a. Hall claimed that the jewelry law enforcement officers had recovered from the pawn shop originally came from a guy he met through his brother. Hall stated he had known this guy for a couple of months. Hall stated that he traded some "weed" (marijuana) for the jewelry that he pawned in

2

Portland, Maine. Hall initially declined to identify the individual he obtained the jewelry from, but later said that he knows him as "T" and said that he is from the Richmond, Maine area.

b. Hall said he asked "T" where the jewelry came from to make sure it was not stolen. "T" told him the jewelry belonged to his grandmother. Hall sold the jewelry at the pawn shop for $300. Hall said he met "T" at the washed-out culvert on Doughty Road while fishing to trade for the jewelry. Hall thought he met "T" on the same day that he pawned the jewelry (Hall was told he pawned the jewelry on June 20th). Later, Hall recalled meeting "T" two times near the culvert to trade. Once, on the day before the pawn shop and once on the same day as the pawn shop. Hall also admitted he actually traded fentanyl, not weed, to "T" for the items.

c. Hall said that on the day he traded the jewelry for drugs, "T" parked on the opposite side of the river (the Route 201 / Augusta Road) and Hall walked down from the house. Hall said he walked across the washed-out section of the road to get the items from "T." Hall said the items were in a black bag. Hall provided TFO Duquette consent to search his Apple iPhone 11 in a dark blue case with a universe emblem on the back to try to identify "T's" phone number. Hall signed an FD-26, Consent to Search Form. T's phone number was not located in the recent calls or text messages. Hall explained the phone must have automatically deleted the contacts after a specific time period. Hall said he prefers to call or use FaceTime over text messages because messages can be intercepted by police.

8.  During the course of his interview, Hall asked for his cell phone that had been located in his bedroom. Hall was provided an iPhone which he said was his. Hall requested that he be able to call Jeanne Doughty to talk to her about the situation. Hall was allowed to do so in the presence of agents. Hall called Doughty from his cell phone and had a short ambiguous conversation about the situation. This phone was eventually seized by Sagadahoc County, Maine Sheriff's as evidence during the course of the warrant. At the conclusion of the search warrant Hall was arrested by the Sagadahoc County, Maine Sheriff's Office.

## **TECHNICAL TERMS**

9.  Based on my training and experience, I use the following technical terms to convey the following meanings:

    a.  Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files;

4

storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

5

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media

can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

10. Based on my training, experience, and research, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

11. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

12. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that

establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

  a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

  b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

  c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

  d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

13.   *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

14.   *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

15. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

Garrett Drew
Special Agent
Federal Bureau of Investigation

Sworn to telephonically and signed electronically in accordance with the requirements of Rule 4.1 of the Federal Rules of Criminal Procedures

Date: Oct 17 2023

City and state: Portland, Maine

_____
Judge's signature

Karen Frink Wolf, U.S. Magistrate Judge
Printed name and title